Michael R. Lozeau (State Bar No. 142893)
Douglas J. Chermak (State Bar No. 233382)
E-mail: michael@lozeaudrury.com
          doug@lozeaudrury.com
LOZEAU DRURY LLP
410 12th Street, Suite 250
Oakland, CA 94607
Tel: (510) 836-4200
Fax: (510) 836-4205

Arthur Pugsley (State Bar No. 252200)
Melissa Kelly (State Bar No. 300817)
E-mail: arthur@lawaterkeeper.org
          melissa@lawaterkeeper.org
LOS ANGELES WATERKEEPER
120 Broadway, Suite 105
Santa Monica, CA 90401
Tel: (310) 394-6162
Fax: (310) 394-6178

Attorneys for Plaintiff
LOS ANGELES WATERKEEPER

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER, a non-profit corporation,<br><br>Plaintiff,<br><br>vs.<br><br>USA WASTE OF CALIFORNIA, INC., a corporation,<br><br>Defendant. | Case No. _____<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

COMPLAINT

1

LOS ANGELES WATERKEEPER ("LAW"), a California non-profit corporation, by and through its counsel, hereby alleges:

## I.   **JURISDICTION AND VENUE**

1.     This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act" or "the Act").  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.     On December 1, 2016, Plaintiff provided notice of Defendant's violations of the Act, and of Plaintiff's intention to file suit against Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Los Angeles Region ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  A true and correct copy of LAW's notice letter is attached as Exhibit A, and is incorporated by reference.

3.     More than sixty days have passed since notice was served on Defendant and the State and federal agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty

COMPLAINT

1    under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

2         4.      Venue is proper in the Central District of California pursuant to Section

3    505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is

4    located within this judicial district.

5    **II.**     **INTRODUCTION**

6         1.      This complaint seeks relief for Defendant's discharges of polluted storm

7    water from Defendant's industrial facility located at 2424 East Olympic Boulevard in

8    Los Angeles, California ("Downtown Diversion Facility") and Defendant's industrial

9    facility located at 11616 Sheldon Street in Sun Valley, California ("East Valley

10   Diversion Facility") in violation of the Act and National Pollutant Discharge

11   Elimination System ("NPDES") Permit No. CAS000001, State Water Resources

12   Control Board Water Quality Order No. 97-03-DWQ ("1997 Permit"), as renewed by

13   Water Quality Order No. 2014-0057-DWQ ("2015 Permit") (the permits are

14   collectively referred to hereinafter as the "Permit" or "General Permit"). Defendant's

15   violations of the discharge, treatment technology, monitoring requirements, and other

16   procedural and substantive requirements of the Permit and the Act are ongoing and

17   continuous.

18         2.      With every significant rainfall event, millions of gallons of polluted

19   storm water originating from industrial operations, such as those conducted by

20   Defendant, pour into storm drains and local waterways. The consensus among

21   agencies and water quality specialists is that storm water pollution accounts for more

22   than half of the total pollution entering surface waters each year.

23         3.      Los Angeles area waters are ecologically sensitive areas and are essential

24   habitat for dozens of fish and bird species as well as macro-invertebrate and

25   invertebrate species. Storm water and non-storm water contaminated with sediment,

26   heavy metals, and other pollutants harm the special aesthetic and recreational

COMPLAINT

significance that Los Angeles area waters have for people in the surrounding communities.  The public's use of Los Angeles area waters for water contact sports exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges.  Non-contact recreation and aesthetic opportunities, such as wildlife observation are also impaired by polluted discharges into Los Angeles area waters.

5.      Industrial facilities, like Defendant's, that are discharging polluted storm water and non-storm water contribute to the impairment of downstream waters and aquatic-dependent wildlife.  These contaminated discharges can and must be controlled for the ecosystem to regain its health.

## III.   PARTIES

6.      Plaintiff LAW is a non-profit public benefit corporation organized under the laws of the State of California with its main office in Santa Monica, California. Founded in 1993, LAW is dedicated to the preservation, protection, and defense of the inland and coastal surface and groundwaters of Los Angeles County from all sources of pollution and degradation.  LAW and its approximately 3,000 members are deeply concerned with protecting the environment in and around their communities, including the Los Angeles River Watershed.  To further these goals, LAW actively seeks federal and state agency implementation of the Act and other laws and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

7.      LAW has members living in the communities adjacent to the Downtown Diversion Facility, the East Valley Diversion Facility, and the Los Angeles River Watershed.  They enjoy using the Los Angeles River for recreation and other activities. Members of LAW use and enjoy the waters into which Defendant has caused, is causing, and will continue to cause, pollutants to be discharged.  Members of LAW use those areas to recreate and view wildlife, among other activities.  Defendant's

COMPLAINT

4

discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments.  Thus, the interests of LAW's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Permit.  The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

8.     LAW brings this action on behalf of its members.  LAW's interest in reducing Defendant's discharges of pollutants into the Los Angeles River and its tributaries and requiring Defendant to comply with the requirements of the General Permit are germane to its purposes.  Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of LAW.

9.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and one or more of its members, for which harm they have no plain, speedy or adequate remedy at law.

10.     Defendant USA WASTE OF CALIFORNIA, INC. ("USA Waste") is a corporation that owns and/or operates the Downtown Diversion Facility and the East Valley Diversion Facility.

## IV.   STATUTORY BACKGROUND

### Clean Water Act

11.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

12.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program.  33

COMPLAINT

1  U.S.C. § 1342(p).  States with approved NPDES permit programs are authorized by

2  Section 402(p) to regulate industrial storm water discharges through individual

3  permits issued to dischargers or through the issuance of a single, statewide general

4  permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(p).

5       13.    The EPA promulgated regulations for the Section 402 NPDES permit

6  program defining waters of the United States. S*ee* 40 C.F.R. § 122.2.  The EPA

7  interprets waters of the United States to include not only traditionally navigable

8  waters but also other waters, including waters tributary to navigable waters, wetlands

9  adjacent to navigable waters, and other waters including intermittent streams that

10  could affect interstate commerce.  The Act requires any person who discharges or

11  proposes to discharge pollutants into waters of the United States to submit an NPDES

12  permit application. 40 C.F.R. § 122.21.

13       14.    A significant nexus is also established if waters that are tributary to

14  navigable waters have flood control properties, including functions such as the

15  reduction of flow, pollutant trapping, and nutrient recycling.  *Id.* at 783.

16       15.    Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator

17  of the U.S. EPA has authorized California's State Board to issue NPDES permits

18  including general NPDES permits in California.

19      **General Permit**

20       16.    The State Board elected to issue a statewide general permit for industrial

21  storm water discharges.  The State Board originally issued the General Permit on or

22  about November 19, 1991.  The State Board modified the General Permit on or about

23  September 17, 1992.  Pertinent to this action, the State Board reissued the General

24  Permit on or about April 17, 1997 (the "1997 Permit"), and again on or about April 1,

25  2014 (the "2015 Permit"), pursuant to Section 402(p) of the Clean Water Act, 33

26  U.S.C. § 1342(p).  The 1997 Permit was in effect between 1997 and June 30, 2015.

28  COMPLAINT

The 2015 Permit went into effect on July 1, 2015.  The 2015 Permit maintains or makes more stringent the same requirements as the 1997 Permit.

17.    In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.  33 U.S.C. § 1311(a).

18.    The General Permit contains several prohibitions.  Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  Discharge Prohibition A(2) of the 1997 Permit and Discharge Prohibition III(C) of the 2015 Permit prohibit storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitation C(1) of the 1997 Permit and Receiving Water Limitation VI(B) of the 2015 Permit prohibit storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the 2015 Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

19.    In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply

COMPLAINT

("NOI").  Dischargers have been required to file NOIs since March 30, 1992.

20.    Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP").  The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  For dischargers beginning industrial activities before October 1, 1992, the General Permit requires that an initial SWPPP has been developed and implemented before October 1, 1992.  The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-storm water discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges.  *See* 1997 Permit, § A(2); 2015 Permit, § X(C).  These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.  To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary.  1997 Permit, §§ A(9), (10); 2015 Permit, § X(B).  Failure to develop or implement an adequate SWPPP, or update or revise an existing SWPPP as required, is a violation of the General Permit.  2015 Permit, Fact Sheet § I(1).

21.    Sections A(3)-A(10) of the 1997 Permit set forth the requirements for a SWPPP.  Among other requirements, the SWPPP must include: a pollution prevention team; a site map; a list of significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of the BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective.  Sections X(D) – X(I) of the 2015 Permit set forth essentially the same SWPPP

COMPLAINT

requirements as the 1997 Permit, except that all dischargers are now required to develop and implement a set of minimum BMPs, as well as any advanced BMPs as necessary to achieve BAT/BCT, which serve as the basis for compliance with the 2015 Permit's technology-based effluent limitations and receiving water limitations. See 2015 Permit, § X(H).  The 2015 Permit further requires a more comprehensive assessment of potential pollutant sources than the 1997 Permit; more specific BMP descriptions; and an additional BMP summary table identifying each identified area of industrial activity, the associated industrial pollutant sources, the industrial pollutants, and the BMPs being implemented.  See 2015 Permit, §§ X(G)(2), (4), (5).  Section X(E) of the 2015 Permit requires that the SWPPP map depict, *inter alia*, all storm water discharge locations.

22.    The 2015 Permit requires dischargers to implement and maintain, to the extent feasible, all of the following minimum BMPs in order to reduce or prevent pollutants in industrial storm water discharges: good housekeeping, preventive maintenance, spill and leak prevention and response, material handling and waste management, erosion and sediment controls, an employee training program, and quality assurance and record keeping.  *See* 2015 Permit, § X(H)(1).  Failure to implement all of these minimum BMPs is a violation of the 2015 Permit.  See 2015 Permit, Fact Sheet § I(2)(o).  The 2015 Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  See 2015 Permit, § X(H)(2).  Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the 2015 Permit.  *Id*.  The 2015 Permit also requires that the SWPPP include BMP

COMPLAINT

descriptions and a BMP Summary Table.  *See* 2015 Permit, § X(H)(4), (5).

23.    The General Permit requires dischargers to develop and implement an adequate written Monitoring and Reporting Program.  The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.  As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.  The 1997 Permit required dischargers to collect storm water samples during the first hour of discharge from the first storm event of the wet season, and at least one other storm event during the wet season, from all storm water discharge locations at a facility.  *See* 1997 Permit, § B(5).  The 2015 Permit now mandates that facility operators sample *four* (rather than two) storm water discharges from all discharge locations over the course of the reporting year.  *See* 2015 Permit, §§ XI(B)(2), (3).

24.    Under the 1997 Permit, facilities must analyze storm water samples for "toxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities."  1997 Permit, § B(5)(c)(ii).  Under the 2015 Permit, facilities must analyze storm water samples for "[a]dditional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment."  2015 Permit, § XI(B)(6)(c).

25.    Under the 2015 Permit, a facility must analyze collected samples for "[a]dditional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs based on the assessment in Section

COMPLAINT

10

1     X.G.2.a.ix."  2015 Permit, § XI(B)(6)(d).

2         26.     Facilities are required to make monthly visual observations of storm

3     water discharges.  The visual observations must represent the quality and quantity of

4     the facility's storm water discharges from the storm event.  1997 Permit, § B(7); 2015

5     Permit, § XI.A.

6         27.    Section XI(B)(2) of the 2015 Permit requires that dischargers collect and

7     analyze storm water samples from two qualifying storm events ("QSEs") during the

8     first half of each reporting year (July 1 to December 31) and two QSEs during the

9     second half of each reporting year (January 1 to June 30).

10        28.    Section B(14) of the 1997 Permit requires dischargers to include

11    laboratory reports with their Annual Reports submitted to the Regional Board.  This

12    requirement is continued with the 2015 Permit.  Fact Sheet, Paragraph O.

13        29.    The 1997 Permit, in relevant part, requires that the Annual Report

14    include an Annual Comprehensive Site Compliance Evaluation Report ("ACSCE

15    Report").  1997 Permit, § B(14).  As part of the ACSCE Report, the facility operator

16    must review and evaluate all of the BMPs to determine whether they are adequate or

17    whether SWPPP revisions are needed.  The Annual Report must be signed and

18    certified by a duly authorized representative, under penalty of law that the information

19    submitted is true, accurate, and complete to the best of his or her knowledge.  The

20    2015 Permit now requires operators to conduct an Annual Comprehensive Facility

21    Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of

22    current BMPs and the need for additional BMPs based on visual observations and

23    sampling and analysis results.  *See* 2015 Permit, § XV.

24        30.    The General Permit does not provide for any mixing zones by

25    dischargers.  The General Permit does not provide for any receiving water dilution

26    credits to be applied by dischargers.

27

28    COMPLAINT

                                          11

**Basin Plan**

31.     The Regional Board has identified beneficial uses and established water quality standards for the Los Angeles River, including its tributary, the Burbank Western Channel, in the "Water Quality Control Plan, Los Angeles Region Basin Plan for the Coastal Watersheds of Los Angeles and Ventura Counties," generally referred to as the Basin Plan.

32.     The beneficial uses of these waters include, among others, municipal and domestic supply, groundwater recharge, water contact recreation, non-contact water recreation, warm freshwater habitat, wildlife habitat, wetland habitat, marine habitat, rare, threatened, or endangered species, preservation of biological habitats, migration of aquatic organisms, spawning, reproduction, and/or early development, and shellfish harvesting.  The non-contact water recreation use is defined as "[u]ses of water for recreational activities involving proximity to water, but not normally involving contact with water where water ingestion is reasonably possible.  These uses include, but are not limited to, picnicking, sunbathing, hiking, beachcombing, camping, boating, tidepool and marine life study, hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities."

33.     The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in, human, plant, animal, or aquatic life."

34.     The Basin Plan includes a narrative oil and grease standard which states that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses."

COMPLAINT

12

35.     The Basin Plan provides that "[w]aters shall not contain suspended or settleable material in concentrations that cause nuisance or adversely affect beneficial uses."

36.     The Basin Plan provides that "[t]he pH of inland surface waters shall not be raised above 8.5 or depressed below 6.5."

37.     The Basin Plan provides that "[w]aters shall not contain floating materials, including solids, liquids, foams, and scum, in concentrations that cause nuisance or adversely affect beneficial uses."

38.     The Basin Plan provides that "[w]aters shall be free of coloration that causes nuisance or adversely affects beneficial uses."

39.     The EPA has adopted freshwater numeric water quality standards for zinc of 0.120 mg/L (Criteria Maximum Concentration – "CMC"); for copper of 0.013 mg/L (CMC); and for lead of 0.065 mg/L (CMC).  65 Fed. Reg. 31712 (May 18, 2000) (California Toxics Rule).

40.     The EPA 303(d) List of Water Quality Limited Segments lists the Tujunga Wash as impaired for copper and trash, among other pollutants.  See http://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2012.shtml. Reach 4 of the Los Angeles River is listed as impaired for copper, lead, nutrients, and trash, among other pollutants.  Reach 3 of the Los Angeles River is impaired for copper, lead, ammonia, nutrients, and trash.  Reach 2 of the Los Angeles River is impaired for trash, oil, nutrients, copper, and lead, among other pollutants.  Reach 1 of the Los Angeles River is impaired for zinc, lead, copper, trash, pH, nutrients, and pathogens, among other pollutants.  The Los Angeles River Estuary is impaired for trash and sediment toxicity, among other pollutants.  San Pedro Bay is impaired for sediment toxicity, among other pollutants.

41.     EPA has established Parameter Benchmark Values as guidelines for

COMPLAINT

determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT.  These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish.  The following EPA benchmarks have been established for pollution parameters applicable to the Facility: pH – 6.0 - 9.0 standard units ("s.u."); total suspended solids ("TSS") – 100 mg/L; oil and grease ("O&G") – 15 mg/L; chemical oxygen demand ("COD") – 120 mg/L; iron – 1.0 mg/L; aluminum – 0.75 mg/L; zinc – 0.26 mg/L; copper – 0.0332 mg/L; and lead – 0.262 mg/L.

42.     The Numeric Action Levels ("NALs") in the 2015 Permit are derived from these benchmarks.  The 2015 Permit incorporates annual NALs, which are derived from the 2008 MSGP benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset.  The following annual NALs have been established under the 2015 Permit: TSS – 100 mg/L; O&G – 15 mg/L; COD – 120 mg/L; iron – 1.0 mg/L; aluminum – 0.75 mg/L; zinc – 0.26 mg/L; copper – 0.0332 mg/L; and lead – 0.262 mg/L.  An exceedance of annual NALs occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL.  The reporting year runs from July 1 to June 30.  The 2015 Permit also establishes the following instantaneous maximum NALs: pH – 6.0-9.0 s.u.; TSS – 400 mg/L; and O&G – 25 mg/L.  An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  When a discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires a revision of the SWPPP and additional BMPs.  If a discharger exceeds an applicable NAL during Level 1 Status, it is then

COMPLAINT

14

elevated to "Level 2 Status."  For Level 2 Status, a discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background.

43.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements.  33 U.S.C. §§ 1365(a)(1) and (f), § 1362(5).  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $51,570 for violations occurring after November 2, 2015; and up to $37,500 per day per violation occurring since October 28, 2011 up to and including November 2, 2015, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365.  *See also* 40 C.F.R. §§ 19.1 - 19.4.

## V.     STATEMENT OF FACTS

### Violations at Downtown Diversion Facility

44.     Defendant owns and/or operates the Downtown Diversion Facility, a construction/demolition debris processing facility located in Los Angeles, CA.

45.     The Downtown Diversion Facility falls within Standard Industrial Classification ("SIC") Codes 5093, 4212, and 4214.

46.     The Downtown Diversion Facility covers an area of 5 acres and is fully paved.

47.     Based on LAW's investigation, including a review of the Downtown Diversion Facility's Notice of Intent to Comply with the Terms of the Industrial General Permit ("NOI"), SWPPP, aerial photography, and LAW's information and belief, storm water is collected and discharged from the Downtown Diversion Facility

COMPLAINT

15

via at least four outfalls.  Storm water discharged from the Downtown Diversion Facility flows into channels that empty into Reach 2 of the Los Angeles River, which flows into Reach 1 of the Los Angeles River and ultimately flows to the Pacific Ocean via the Los Angeles River Estuary and San Pedro Bay (collectively, "Downtown Diversion Receiving Waters").

48.     Information available to Plaintiff indicates that the Downtown Diversion Receiving Waters are waters of the United States.

49.     Plaintiff is informed and believes, and thereupon alleges that the storm water flows over the surface of the Downtown Diversion Facility where industrial activities occur including receiving materials and product transport, maintenance of trucks and equipment, welding, and areas where airborne materials associated with the industrial processes at the Downtown Diversion Facility may settle onto the ground. Plaintiff is informed and believes, and thereupon alleges that storm water flowing over these areas collects suspended sediment, dirt, metals, and other pollutants as it flows towards the storm water discharge locations.

50.     On information and belief, Plaintiff alleges that the majority of storm water discharges from the Downtown Diversion Facility contain storm water that is commingled with runoff from areas at the Downtown Diversion Facility where industrial processes occur.

51.     On information and belief, LAW alleges that there are insufficient structural storm water control measures installed at the Downtown Diversion Facility. Plaintiff is informed and believes, and thereupon alleges, that the management practices at the Downtown Diversion Facility are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.  The Downtown Diversion Facility lacks sufficient structural controls such as grading, berming, roofing, containment, or drainage

COMPLAINT

structures to prevent rainfall and storm water flows from coming into contact with exposed areas of contaminants.  The Downtown Diversion Facility lacks sufficient structural controls to prevent the discharge of water once contaminated.  The Downtown Diversion Facility lacks adequate storm water pollution treatment technologies to treat storm water once contaminated.

52.     Since at least December 31, 2011, Defendant has taken samples or arranged for samples to be taken of storm water discharges at the Downtown Diversion Facility.  The sample results were reported in the Downtown Diversion Facility's Annual Reports submitted to the Regional Board.  Defendant certified each of those Annual Reports pursuant to the General Permit.

53.     In Annual Reports and storm water sampling results submitted to the Regional Board for the past four years, the Downtown Diversion Facility has consistently reported high pollutant levels from its storm water sampling results.

54.     The Downtown Diversion Facility has reported numerous discharges in excess of narrative and numeric water quality standards established in the Basin Plan. These observations have thus violated narrative and numeric water quality standards established in the Basin Plan and have thus violated Discharge Prohibition A(2) and Receiving Water Limitations C(1) and C(2) of the 1997 Permit; Discharge Prohibitions III(C) and III(D) and Receiving Water Limitations VI(A) and VI(B) of the 2015 Permit; and are evidence of ongoing violations of Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit.

55.     The Downtown Diversion Facility has reported numerous discharges outside of the range of the numeric water quality standard for pH of 6.5 – 8.5 s.u. established in the Basin Plan.  Defendant measured storm water discharges from the Downtown Diversion Facility with a pH level either below 6.5 s.u. or above 8.5 s.u. on the following dates: January 11, 2017; December 16, 2016; November 21, 2016;

COMPLAINT

1  January 5, 2016; and September 15, 2015.

2      56.    The levels of pH in storm water detected by the Downtown Diversion

3  Facility have exceeded the benchmark value and annual NAL for pH of 6.0 – 9.0 s.u.

4  established by EPA and the State Board, respectively.  On January 5, 2016, the level

5  of pH in storm water measured by Defendant at one of the Downtown Diversion

6  Facility's outfalls was 9.02 s.u.

7      57.    The Downtown Diversion Facility has reported violations of the narrative

8  water quality standards for discoloration and sheen contained in the Basin Plan.

9  Discharges that violated at least one of these standards occurred on the following

10  dates: December 2, 2014; February 27, 2014; and March 17, 2012.

11      58.    The levels of TSS in storm water detected by the Downtown Diversion

12  Facility have exceeded the benchmark value and annual NAL for TSS of 100 mg/L

13  established by EPA and the State Board, respectively.  For example, on December 2,

14  2014, the level of TSS measured by Defendant at one of the Downtown Diversion

15  Facility's outfalls was 290 mg/L.  That level of TSS is almost 3 times the benchmark

16  value and annual NAL for TSS.  Defendant also has measured levels of TSS in storm

17  water discharged from the Downtown Diversion Facility in excess of 100 mg/L on

18  January 11, 2017; January 5, 2016; February 27, 2014; and March 17, 2012.

19      59.    The levels of zinc in storm water detected by the Downtown Diversion

20  Facility have exceeded the freshwater numeric water quality standard established by

21  the EPA of 0.12 mg/L for zinc (CMC) for zinc.  For example, on December 2, 2014,

22  the level of zinc measured at one of the Downtown Diversion Facility's storm water

23  outfalls was 0.41 mg/L.  That level of zinc is over 3 times the CMC for zinc.

24  Defendant also has measured levels of zinc in storm water discharged from the

25  Downtown Diversion Facility in excess of 0.12 mg/L on December 12, 2014;

26  February 27, 2014; and March 17, 2012.

27

28  COMPLAINT

18

60.   The levels of zinc in storm water detected by the Downtown Diversion Facility have exceeded the benchmark value and annual NAL for zinc of 0.26 mg/L established by EPA and the State Board, respectively.  For example, on December 2, 2014, the level of zinc measured at one of the Downtown Diversion Facility's storm water outfalls was 0.41 mg/L.  That level of zinc is over 1.5 times the benchmark value and annual NAL for zinc.  Defendant also has measured levels of zinc in storm water discharged from the Downtown Diversion Facility in excess of 0.26 mg/L on February 27, 2014; and March 17, 2012.

61.   The levels of copper in storm water detected by the Downtown Diversion Facility have exceeded the freshwater numeric water quality standard established by the EPA of 0.013 mg/L (CMC).  For example, on December 2, 2014, the level of copper measured at one of the Downtown Diversion Facility's storm water outfalls was 0.069 mg/L.  That level of copper is over 5 times the CMC for copper.  Defendant also has measured levels of copper in storm water discharged from the Downtown Diversion Facility in excess of 0.013 mg/L on December 12, 2014; February 27, 2014; and March 17, 2012.

62.   The levels of copper in storm water detected by the Downtown Diversion Facility have exceeded the benchmark value and annual NAL for copper of 0.0332 mg/L established by EPA and the State Board, respectively.  On December 2, 2014, the level of copper measured by Defendant at one of the Downtown Diversion Facility's storm water outfalls was 0.069 mg/L.  That level of copper is over twice the benchmark value and annual NAL for copper.  Defendant also has measured levels of copper in storm water discharged from the Downtown Diversion Facility in excess of 0.0332 mg/L on February 27, 2014; and March 17, 2012.

63.   The levels of lead in storm water detected by the Downtown Diversion Facility have exceeded the freshwater numeric water quality standard established by

COMPLAINT

the EPA of 0.065 mg/L (CMC).  For example, on December 2, 2014, the level of copper measured at one of the Downtown Diversion Facility's storm water outfalls was 0.09 mg/L.  That level of copper is almost 1.5 times the CMC for copper. Defendant also has measured levels of copper in storm water discharged from the Downtown Diversion Facility in excess of 0.065 mg/L on March 17, 2012.

64.     The levels of iron in storm water detected by the Downtown Diversion Facility have exceeded the benchmark value and annual NAL for iron of 1 mg/L established by EPA and the State Board, respectively.  For example, on December 2, 2014, the level of iron measured by Defendant at one of the Downtown Diversion Facility's storm water outfalls was 10 mg/L.  That level of copper is ten times the benchmark value and annual NAL for iron.  Defendant also has measured levels of iron in storm water discharged from the Downtown Diversion Facility in excess of 1 mg/L on December 12, 2014; February 27, 2014; and March 17, 2012.

65.     The levels of aluminum in storm water detected by the Downtown Diversion Facility have exceeded the benchmark value and annual NAL for aluminum of 0.75 mg/L established by EPA and the State Board, respectively.  For example, on December 2, 2014, the level of aluminum measured by Defendant at one of the Downtown Diversion Facility's storm water outfalls was 9 mg/L.  That level of aluminum is 12 times the benchmark value and annual NAL for aluminum. Defendant also has measured levels of aluminum in storm water discharged from the Downtown Diversion Facility in excess of 0.75 mg/L on December 12, 2014; February 27, 2014; and March 17, 2012.

66.     The levels of COD in storm water detected by the Downtown Diversion Facility have exceeded the benchmark value and annual NAL for COD of 120 mg/L established by EPA and the State Board, respectively.  On December 2, 2014, the level of COD measured by Defendant at one of the Downtown Diversion Facility's

COMPLAINT

storm water outfalls was 140 mg/L.

67.     On information and belief, LAW alleges that COD, iron, aluminum, zinc, copper, and lead are pollutants likely to be present in the Downtown Diversion Facility's storm water discharges in significant quantities and that those pollutants have been present in the Facility's storm water discharges during the past five years. On information and belief, LAW alleges that the Downtown Diversion Facility is required to analyze its storm water discharges for COD, iron, aluminum, zinc, copper, and lead because the facility falls under SIC Code 5093.  On information and belief, LAW alleges that Defendant never analyzed the Downtown Diversion Facility's storm water discharges for COD, iron, aluminum, zinc, copper, and lead, since December 12, 2014.

68.     On information and belief, LAW alleges that during the 2015-2016 reporting year, Defendant failed to collect and analyze storm water samples from two out of four storm events at the Downtown Diversion Facility.

69.     On information and belief, LAW alleges that during the 2013-2014 wet season, Defendant failed to collect and analyze storm water samples from a second storm event at the Downtown Diversion Facility.

70.     On information and belief, LAW alleges that during the 2012-2013 wet season, Defendant failed to collect and analyze storm water samples from any storm events at the Downtown Diversion Facility.

71.     On information and belief, LAW alleges that discharges occurred from the Downtown Diversion Facility on the following dates: October 11, 2012; November 8, 2012; December 13, 2012; December 18, 2012; December 24, 2012; January 24, 2013; January 25, 2013; February 8, 2013; March 8, 2013; May 6, 2013; November 21, 2013; December 19, 2013; March 5, 2014; April 25, 2014; November 3, 2015; December 19, 2015; December 22, 2015; December 29, 2015; February 17, 2016; March 11, 2016; and April 9, 2016.

COMPLAINT

72.     On information and belief, LAW alleges that Defendant has consistently failed to collect and analyze storm water discharges from all of the sampling locations at the Downtown Diversion Facility.  During the 2015-2016 reporting year, Defendant failed to collect and analyze storm water discharges from one of its outfalls.  During the 2014-2015 wet season, Defendant failed to collect and analyze storm water discharges from two of its outfalls.  During the 2013-2014 wet season, Defendant failed to collect and analyze storm water discharges from one of its outfalls.  During the 2011-2012 wet season, Defendant failed to collect and analyze storm water discharges from one of its outfalls.

73.     On information and belief, LAW alleges that Defendant failed to conduct monthly visual observations of storm water discharges at the Downtown Diversion Facility during the following months: 2011 – December; 2012 – January, February, April, October, November, December; 2013 – January, February, March, May, November, December; 2014 – March, April; 2015 – January, March, April, May.

74.     On information and belief, LAW alleges that Defendant has consistently failed to comply with Section B(14) of the 1997 Permit, and Section XV of the 2015 Permit, by failing to complete proper ACSCE Reports as well as proper Annual Evaluations for the Downtown Diversion Facility.

75.     On information and belief, Plaintiff alleges that since at least December 31, 2011, Defendant has failed to implement BAT and BCT at the Downtown Diversion Facility for its discharges of pH, zinc, copper, lead, aluminum, iron, TSS, COD and other potentially un-monitored pollutants.  Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit requires that Defendant implement BAT for toxic and nonconventional pollutants and BCT for conventional pollutants by no later than October 1, 1992.  As of the date of this Complaint, Defendant has failed to implement BAT and BCT.

COMPLAINT

22

76.     On information and belief, Plaintiff alleges that since at least December 31, 2011, Defendant has failed to implement an adequate SWPPP for the Downtown Diversion Facility.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Downtown Diversion Facility does not set forth site-specific best management practices for the Facility that are consistent with BAT or BCT for the Downtown Diversion Facility.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Downtown Diversion Facility does not comply with the requirements of Section X(H) of the 2015 Permit.  The SWPPP also fails to identify and implement advanced BMPs that are not being implemented at the Downtown Diversion Facility because they do not reflect best industry practice considering BAT/BCT.  According to information available to LAW, the Downtown Diversion Facility's SWPPP has not been evaluated to ensure its effectiveness and revised where necessary to further reduce pollutant discharges.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP does not include each of the mandatory elements required by the General Permit.

77.     Information available to LAW indicates that as a result of these practices, storm water containing excessive pollutants is being discharged from the Downtown Diversion Facility during rain events into channels that empty into Reach 2 of the Los Angeles River, which flows into Reach 1 of the Los Angeles River and ultimately flows to the Pacific Ocean via the Los Angeles River Estuary and San Pedro Bay.

78.     Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed and continues to fail to alter the Downtown Diversion Facility's SWPPP and site-specific BMPs consistent with the General Permit.

79.     Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Downtown Diversion Facility due to the continued discharge of contaminated storm

COMPLAINT

23

water.  Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuous.

**Violations at East Valley Diversion Facility**

80.    Defendant owns and/or operates the East Valley Diversion Facility, a construction/demolition debris processing facility located in Sun Valley, CA.

81.    The East Valley Diversion Facility falls within SIC Codes 5093, 4212, and 4214.

82.    The East Valley Diversion Facility covers an area of 2 acres and is fully paved.

83.    Based on LAW's investigation, including a review of the East Valley Diversion Facility's NOI, SWPPP, aerial photography, and LAW's information and belief, storm water is collected and discharged from the East Valley Diversion Facility via at least two outfalls.  Storm water discharged from the East Valley Diversion Facility flows into channels that empty into the Tujunga Wash.  The Tujunga Wash flows into Reach 4 of the Los Angeles River, which flows into Reaches 3, 2, and then 1 of the Los Angeles River and ultimately flows to the Pacific Ocean via the Los Angeles River Estuary and San Pedro Bay (collectively, "East Valley Diversion Receiving Waters").

84.    Information available to Plaintiff indicates the East Valley Diversion Receiving Waters are waters of the United States.

85.    Plaintiff is informed and believes, and thereupon alleges that the storm water flows over the surface of the East Valley Diversion Facility where industrial activities occur including receiving materials and product transport, maintenance of trucks and equipment, fueling of trucks, welding, painting and areas where airborne materials associated with the industrial processes at the East Valley Diversion Facility may settle onto the ground.  Plaintiff is informed and believes, and thereupon alleges

COMPLAINT

that storm water flowing over these areas collects suspended sediment, dirt, metals, and other pollutants as it flows towards the storm water discharge locations.

86.    On information and belief, Plaintiff alleges that the majority of storm water discharges from the East Valley Diversion Facility contain storm water that is commingled with runoff from areas at the East Valley Diversion Facility where industrial processes occur.

87.    On information and belief, LAW alleges that there are insufficient structural storm water control measures installed at the East Valley Diversion Facility. Plaintiff is informed and believes, and thereupon alleges, that the management practices at the East Valley Diversion Facility are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.  The East Valley Diversion Facility lacks sufficient structural controls such as grading, berming, roofing, containment, or drainage structures to prevent rainfall and storm water flows from coming into contact with exposed areas of contaminants.  The East Valley Diversion Facility lacks sufficient structural controls to prevent the discharge of water once contaminated.  The East Valley Diversion Facility lacks adequate storm water pollution treatment technologies to treat storm water once contaminated.

88.    Since at least December 31, 2011, Defendant has taken samples or arranged for samples to be taken of storm water discharges at the East Valley Diversion Facility.  The sample results were reported in the East Valley Diversion Facility's Annual Reports submitted to the Regional Board.  Defendant certified each of those Annual Reports pursuant to the General Permit.

89.    In Annual Reports and storm water sampling results submitted to the Regional Board for the past four years, the East Valley Diversion Facility has consistently reported high pollutant levels from its storm water sampling results.

COMPLAINT

25

90.     The East Valley Diversion Facility has reported numerous discharges in excess of narrative and numeric water quality standards established in the Basin Plan. These observations have thus violated narrative and numeric water quality standards established in the Basin Plan and have thus violated Discharge Prohibition A(2) and Receiving Water Limitations C(1) and C(2) of the 1997 Permit; Discharge Prohibitions III(C) and III(D) and Receiving Water Limitations VI(A) and VI(B) of the 2015 Permit; and are evidence of ongoing violations of Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit.

91.     The East Valley Diversion Facility has reported discharges outside of the range of the numeric water quality standard for pH of 6.5 – 8.5 s.u. established in the Basin Plan.  Defendant measured storm water discharges from the East Valley Diversion Facility with a pH level either below 6.5 s.u. or above 8.5 s.u. on the following dates: January 20, 2017; and January 5, 2016.

92.     The East Valley Diversion Facility has reported violations of the narrative water quality standards for discoloration and floating objects contained in the Basin Plan.  Discharges that violated these standards occurred on the following dates: December 2, 2014; and February 28, 2014.

93.     The levels of TSS in storm water detected by the East Valley Diversion Facility have exceeded the benchmark value and annual NAL for TSS of 100 mg/L established by EPA and the State Board, respectively.  Defendant measured levels of TSS in storm water discharged from the East Valley Diversion Facility in excess of 100 mg/L on January 12, 2017; and December 30, 2016.

94.     The levels of zinc in storm water detected by the East Valley Diversion Facility have exceeded the freshwater numeric water quality standard established by the EPA of 0.12 mg/L for zinc (CMC) for zinc.  For example, on February 28, 2014, the level of zinc measured at one of the East Valley Diversion Facility's storm water

COMPLAINT

26

outfalls was 1.6 mg/L. That level of zinc is over 13 times the CMC for zinc. Defendant also has measured levels of zinc in storm water discharged from the East Valley Diversion Facility in excess of 0.12 mg/L on March 17, 2012.

95.     The levels of zinc in storm water detected by the East Valley Diversion Facility have exceeded the benchmark value and annual NAL for zinc of 0.26 mg/L established by EPA and the State Board, respectively. For example, on February 28, 2014, the level of zinc measured at one of the East Valley Diversion Facility's storm water outfalls was 1.6 mg/L. That level of zinc is over 6 times the benchmark value and annual NAL for zinc. Defendant also has measured levels of zinc in storm water discharged from the East Valley Diversion Facility in excess of 0.26 mg/L on March 17, 2012.

96.     The levels of copper in storm water detected by the East Valley Diversion Facility have exceeded the freshwater numeric water quality standard established by the EPA of 0.013 mg/L (CMC). On March 17, 2012, the level of copper measured at one of the East Valley Diversion Facility's storm water outfalls was 0.21 mg/L. That level of copper is over 16 times the CMC for copper. Defendant also has measured levels of copper in storm water discharged from the East Valley Diversion Facility in excess of 0.013 mg/L on December 2, 2014; and February 28, 2014.

97.     The levels of copper in storm water detected by the East Valley Diversion Facility have exceeded the benchmark value and annual NAL for copper of 0.0332 mg/L established by EPA and the State Board, respectively. On March 17, 2012, the level of copper measured by Defendant at one of the East Valley Diversion Facility's storm water outfalls was 0.21 mg/L. That level of copper is over 6 times the benchmark value and annual NAL for copper.

98.     The levels of iron in storm water detected by the East Valley Diversion

COMPLAINT

27

1   Facility have exceeded the benchmark value and annual NAL for iron of 1 mg/L

2   established by EPA and the State Board, respectively.  For example, on December 2,

3   2014, the level of iron measured by Defendant at one of the East Valley Diversion

4   Facility's storm water outfalls was 11 mg/L.  That level of copper is 11 times the

5   benchmark value and annual NAL for iron.  Defendant also has measured levels of

6   iron in storm water discharged from the East Valley Diversion Facility in excess of 1

7   mg/L on February 28, 2014; and March 17, 2012.

8       99.    The levels of aluminum in storm water detected by the East Valley

9   Diversion Facility have exceeded the benchmark value and annual NAL for aluminum

10  of 0.75 mg/L established by EPA and the State Board, respectively.  For example, on

11  December 2, 2014, the level of aluminum measured by Defendant at one of the East

12  Valley Diversion Facility's storm water outfalls was 8.4 mg/L.  That level of

13  aluminum is over 11 times the benchmark value and annual NAL for aluminum.

14  Defendant also has measured levels of aluminum in storm water discharged from the

15  East Valley Diversion Facility in excess of 0.75 mg/L on February 28, 2014; and

16  March 17, 2012.

17      100.   On information and belief, LAW alleges that iron, aluminum, zinc, and

18  copper are pollutants likely to be present in the East Valley Diversion Facility's storm

19  water discharges in significant quantities and that those pollutants have been present

20  in the Facility's storm water discharges during the past five years.  On information

21  and belief, LAW alleges that the East Valley Diversion Facility is required to analyze

22  its storm water discharges for iron, aluminum, zinc, and copper because the facility

23  falls under SIC Code 5093.  On information and belief, LAW alleges that Defendant

24  never analyzed the East Valley Diversion Facility's storm water discharges for iron,

25  aluminum, zinc, and copper since December 12, 2014.

26      101.   On information and belief, LAW alleges that during the 2015-2016

27

28  COMPLAINT

                                        28

reporting year, Defendant failed to collect and analyze storm water samples from two out of four storm events at the East Valley Diversion Facility.

102.   On information and belief, LAW alleges that during the 2013-2014 wet season, Defendant failed to collect and analyze storm water samples from a second storm event at the East Valley Diversion Facility.

103.   On information and belief, LAW alleges that during the 2012-2013 wet season, Defendant failed to collect and analyze storm water samples from any storm events at the East Valley Diversion Facility.

104.   On information and belief, LAW alleges that discharges occurred from the East Valley Diversion Facility on the following dates: November 30, 2012; May 6, 2013; December 19, 2013; February 17, 2016; March 11, 2016; and March 29, 2016.

105.   On information and belief, LAW alleges that Defendant has consistently failed to comply with Section B(14) of the 1997 Permit, and Section XV of the 2015 Permit, by failing to complete proper ACSCE Reports as well as proper Annual Evaluations for the East Valley Diversion Facility.

106.   On information and belief, Plaintiff alleges that since at least December 31, 2011, Defendant has failed to implement BAT and BCT at the East Valley Diversion Facility for its discharges of pH, zinc, copper, aluminum, iron, TSS, and other potentially un-monitored pollutants.  Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit requires that Defendant implement BAT for toxic and nonconventional pollutants and BCT for conventional pollutants by no later than October 1, 1992.  As of the date of this Complaint, Defendant has failed to implement BAT and BCT.

107.   On information and belief, Plaintiff alleges that since at least December 31, 2011, Defendant has failed to implement an adequate SWPPP for the East Valley Diversion Facility.  Plaintiff is informed and believes, and thereupon alleges, that the

COMPLAINT

29

SWPPP prepared for the East Valley Diversion Facility does not set forth site-specific best management practices for the Facility that are consistent with BAT or BCT for the East Valley Diversion Facility.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the East Valley Diversion Facility does not comply with the requirements of Section X(H) of the 2015 Permit.  The SWPPP also fails to identify and implement advanced BMPs that are not being implemented at the East Valley Diversion Facility because they do not reflect best industry practice considering BAT/BCT.  According to information available to LAW, the East Valley Diversion Facility's SWPPP has not been evaluated to ensure its effectiveness and revised where necessary to further reduce pollutant discharges.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP does not include each of the mandatory elements required by the General Permit.

108.   Information available to LAW indicates that as a result of these practices, storm water containing excessive pollutants is being discharged from the East Valley Diversion Facility during rain events into channels that empty into the Tujunga Wash. The Tujunga Wash flows into Reach 4 of the Los Angeles River, which flows into Reaches 3, 2, and then 1 of the Los Angeles River and ultimately flows to the Pacific Ocean via the Los Angeles River Estuary and San Pedro Bay.

109.   Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed and continues to fail to alter the East Valley Diversion Facility's SWPPP and site-specific BMPs consistent with the General Permit.

110.   Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the East Valley Diversion Facility due to the continued discharge of contaminated storm water. Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuous.

COMPLAINT

## VI.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Failure to Implement the Best Available and
Best Conventional Treatment Technologies
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

111.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

112.   The General Permit's SWPPP requirements and Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  Defendant has failed to implement BAT and BCT at the Downtown Diversion Facility and the East Valley Diversion, respectively, for their discharges of pH, zinc, copper, iron, aluminum, lead, TSS, COD, and other potentially un-monitored pollutants in violation of Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit.

113.   Each day since December 31, 2011, that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

114.   Defendant has been in violation of the BAT/BCT requirements every day since December 31, 2011.  Defendant continues to be in violation of the BAT/BCT requirements each day that they fail to develop and fully implement BAT/BCT at the Facility.

///

///

COMPLAINT

31

**SECOND CAUSE OF ACTION**
**Discharges of Contaminated Storm Water**
**in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

115.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

116.   Discharge Prohibition A(2) of the 1997 Permit and Discharge Prohibition III(C) of the 2015 Permit prohibit storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance. Receiving Water Limitation C(1) of the 1997 Permit and Receiving Water Limitation VI(B) of the 2015 Permit prohibit storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the 2015 Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

117.   Plaintiff is informed and believes, and thereupon alleges, that since at least December 31, 2011, Defendant has been discharging polluted storm water from the Downtown Diversion Facility and the East Valley Diversion Facility, respectively, in excess of the applicable water quality standards for pH, zinc, copper, lead, as well as narrative water quality standards in violation of Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the 2015 Permit.

118.   During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at the Downtown Diversion Facility and the East Valley Diversion Facility, becoming contaminated with pH, zinc, copper,

COMPLAINT

32

lead, sediment, oil & grease, and other potentially un-monitored pollutants at levels above applicable water quality standards.  The storm water from the Downtown Diversion Facility then flows untreated into channels that empty into Reach 2 of the Los Angeles River, which flows into Reach 1 of the Los Angeles River and ultimately flows to the Pacific Ocean via the Los Angeles River Estuary and San Pedro Bay.  The storm water from the East Valley Diversion Facility then flows into channels that empty into the Tujunga Wash.  The Tujunga Wash flows into Reach 4 of the Los Angeles River, which flows into Reaches 3, 2, and then 1 of the Los Angeles River and ultimately flows to the Pacific Ocean via the Los Angeles River Estuary and San Pedro Bay.

119.   Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

120.   Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation C(1) of the General Permit.

121.   Every day since at least December 31, 2011, that Defendant has discharged and continue to discharge polluted storm water from the Downtown Diversion Facility and the East Valley Diversion Facility, respectively, in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

///

///

COMPLAINT

33

**THIRD CAUSE OF ACTION**
**Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

122.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

123.    The General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP no later than October 1, 1992.

124.    Defendant has failed to develop and implement an adequate SWPPP for the Downtown Diversion Facility and the East Valley Diversion Facility, respectively. Defendant's ongoing failure to develop and implement an adequate SWPPP for the Downtown Diversion Facility and the East Valley Diversion Facility is evidenced by, *inter alia*, Defendant's failure to justify each minimum and advanced BMP not being implemented.

125.    Defendant has failed to update the Downtown Diversion Facility's and the East Valley Diversion Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring.

126.    Each day since December 31, 2011, that Defendant has failed to develop, implement and update an adequate SWPPP for the Downtown Diversion Facility and the East Valley Diversion Facility, respectively, is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

127.    Defendant has been in violation of the SWPPP requirements every day since December 31, 2011.  Defendant continues to be in violation of the SWPPP requirements each day that it fails to develop and fully implement an adequate SWPPP for the Downtown Diversion Facility and the East Valley Diversion Facility, respectively.

COMPLAINT

34

## FOURTH CAUSE OF ACTION
### Failure to Develop and Implement an
### Adequate Monitoring and Reporting Program
### (Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

128.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

129.   The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including, *inter alia*, sampling and analysis of discharges) no later than October 1, 1992.

130.   Defendant has failed to develop and implement an adequate monitoring and reporting program for the Downtown Diversion Facility and the East Valley Diversion Facility, respectively.

131.   Defendant's ongoing failure to develop and implement an adequate monitoring and reporting program are evidenced by, *inter alia*, its failure to analyze storm water discharges for numerous parameters including zinc, copper, aluminum, and iron.

132.   Each day since at least December 31, 2011, that Defendant has failed to develop and implement an adequate monitoring and reporting program for the Downtown Diversion Facility and the East Valley Diversion Facility, respectively, in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

///

///

COMPLAINT

## VII.   <u>RELIEF REQUESTED</u>

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.   Declare Defendant to have violated and to be in violation of the Act as alleged herein;

b.   Enjoin Defendant from discharging polluted storm water from the Downtown Diversion Facility and the East Valley Diversion Facility, respectively, unless authorized by the 2015 Permit;

c.   Enjoin Defendant from further violating the substantive and procedural requirements of the 2015 Permit;

d.   Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

e.   Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that prevent pollutants in the Downtown Diversion Facility's and the East Valley Diversion Facility's storm water from contributing to violations of any water quality standards;

f.   Order Defendant to comply with the Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

g.   Order Defendant to prepare a SWPPP for the Downtown Diversion Facility and a SWPPP for the East Valley Diversion Facility consistent with the Permit's requirements and implement procedures to regularly review and update the SWPPP;

h.   Order Defendant to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts

COMPLAINT

36

to comply with the Act and the Court's orders;

i.   Order Defendant to pay civil penalties of up to $37,500 per day per violation for each violation of the Act since October 28, 2011, up to and including November 2, 2015, and up to $51,570 for violations occurring after November 2, 2015, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

j.   Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

k.   Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

l.   Award any such other and further relief as this Court may deem appropriate.

Dated: March 1, 2017                    Respectfully submitted,


                                        By:    __/s/ Douglas J. Chermak_____
                                               Douglas J. Chermak
                                               LOZEAU DRURY LLP
                                               Attorneys for Los Angeles Waterkeeper

COMPLAINT

37